# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER T. BARNETT,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:11cv00038 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL ASTRUE,** | ) | |
| **Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Christopher T. Barnett, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2012).   Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).   Substantial evidence has been defined as

Case 2:11-cv-00038-JPJ-PMS   Document 16   Filed 07/23/12   Page 1 of 27   Pageid#: 2442

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Barnett filed his initial applications for DIB and SSI on or about May 24, 2000,[1] alleging disability as of May 4, 2000,[2] based on a back disorder with numbness in his left leg. (Record, ("R."), at 166-70, 191, 827-31.) His claims were denied initially and upon reconsideration. (R. at 120-22, 123, 125-26, 835-36.) Barnett then requested a hearing before an administrative law judge, ("ALJ"). (R. at 127.) An initial hearing was held on May 17, 2001, at which Barnett was represented by counsel. (R. at 44-49.) This initial hearing was continued to allow additional medical evidence to be gathered and submitted. (R. at 47.) A second hearing was held on September 20, 2001, at which Barnett was again represented by counsel. (R. at 50-70.) By decision dated October 26, 2001, the ALJ denied Barnett's claims.[3] (R. at 148.) Barnett filed a request for review, and the Appeals Council vacated the ALJ's decision and remanded Barnett's case to the ALJ for further review of his alleged mental impairments. (R. at 148-50.) A

_____

[1]Barnett filed subsequent applications for DIB and SSI on November 27, 2001, which were consolidated with his earlier applications. (R. at 22, 149, 181-83, 837-39.)

[2]Barnett's original application alleged disability as of June 21, 1999. (R. at 166.) Barnett later amended his application to allege disability as of May 4, 2000, based on his working until this date. (R. 170, 831.)

[3]The ALJ's October 26, 2001, decision is not included in the record before the court.

third hearing was held on April 2, 2003, at which Barnett was once again represented by counsel. (R. at 71-109.)

By decision dated April 11, 2003, the ALJ again denied Barnett's DIB and SSI claims. (R. at 12, 22-38.) After the ALJ issued his opinion, Barnett pursued his administrative appeals, (R. at 18), but the Appeals Council denied his request for review. (R. at 12-15.) Barnett then filed an action seeking review of the ALJ's unfavorable decision in this court. By Opinion dated February 23, 2007, this court vacated the ALJ's decision denying benefits and remanded Barnett's claims to the Commissioner for further development. (R. at 1010-30.)

On October 12, 2005, Barnett filed additional applications for DIB and SSI alleging the date of disability as April 12, 2003 – the date following the ALJ's earlier decision denying benefits. A hearing was held before an ALJ on these claims on August 9, 2007, at which Barnett was represented by counsel. (R. at 2286-2322.) By decision dated November 15, 2007, the ALJ denied these DIB and SSI claims.[4] Barnett filed a request for review, and the Appeals Council vacated the ALJ's decision, consolidated these claims with the claims remanded by this court and remanded all of Barnett's claims to the ALJ for further review.[5] Upon remand, another hearing was held before an ALJ on October 22, 2010, at which Barnett, again, was represented by counsel (R. at 2323-53.) At this hearing, Barnett amended his claims to seek a closed period of benefits from May 4, 2000, to his return to full-time employment in October 2007. (R. at 23, 26.)

_____

[4]The ALJ's November 15, 2007, decision is not included in the record provided to the court.

[5] The Appeals Council's May 12, 2010, order remanding Barnett's claims to the ALJ is not included in the record provided to the court.

Case 2:11-cv-00038-JPJ-PMS   Document 16   Filed 07/23/12   Page 3 of 27   Pageid#: 2444

By decision dated January 5, 2011, the ALJ again denied Barnett's claims for benefits. (R. at 867-99.) The ALJ found that Barnett met the insured status requirements of the Act for DIB purposes and was insured for benefits through the period for which he was seeking benefits. (R. at 897-98.) The ALJ found that Barnett had not engaged in substantial gainful activity during this period. (R. at 898.) The ALJ also found that the medical evidence established that Barnett had severe impairments, namely a back impairment, diabetes, obesity, a depression/adjustment disorder and an anxiety disorder, but the ALJ found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 893.) The ALJ found that Barnett's allegations regarding his limitations were not totally credible. (R. at 898.) The ALJ found that Barnett had the residual functional capacity to perform light work[6] that did not require any pushing or pulling with his extremities of weights heavier than 20 pounds, climbing ladders, ropes or scaffolding or exposure to working around hazardous machines, at unprotected heights or on vibrating surfaces. (R. at 895.) The ALJ also found that Barnett could perform only simple, routine, repetitive, unskilled tasks. (R. at 895.) The ALJ further found that Barnett could return to his past relevant work as fast food worker. (R. at 896.) The ALJ also found that Barnett could perform other jobs that existed in the national economy in significant numbers. (R. at 896-97.) Thus, the ALJ found that Barnett was not under a disability, as defined in the Act, and was not entitled to benefits. (R. at 898-99.) *See* 20 C.F.R. §§ 404.1520(f), (g), 416.920(f), (g) (2012).

---

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

After the ALJ issued her decision, Barnett pursued his administrative appeals, (R. at 859), but the Appeals Council denied his request for review. (R. at 847-49.) Barnett then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2012). The case is before this court on Barnett's motion for summary judgment filed April 13, 2012, and the Commissioner's motion for summary judgment filed May 14, 2012.

## II. Facts

Barnett was born in 1971, (R. at 166), which classifies him as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c). He completed the eleventh grade and subsequently received his general equivalency development diploma, ("GED"). (R. at 197.) Barnett has past relevant work experience as a cook and manager of a pizza restaurant, a computer technician and a security guard. (R. at 192.)

At his April 2, 2003, hearing, Barnett testified that he suffered from chronic back and left leg pain. (R. at 76-77.) Barnett stated that his left leg often went numb, causing him to fall. (R. at 77.) Barnett stated that he used a walker to prevent further falls. (R. at 78.) At his August 9, 2007, hearing, Barnett testified that he returned to work part-time in November 2006. (R. at 2291.) Barnett stated that he used a crutch to walk because he had fallen "hundreds of times" because his left leg would go numb. (R. at 2298.) Barnett said that he could sit for only 30 minutes and stand for only 10 minutes before needing to change positions due to pain. (R. at 2305-06.)

At his October 22, 2010, hearing, Barnett testified that from 1999 to 2007 he could walk only 10 to 12 feet at a time. (R. at 2333.) A psychological expert, Gerry Bennett, a licensed clinical psychologist, also testified at the October 22 hearing. Bennett stated that, from his review of the record, Barnett had suffered from depression and anxiety. (R. at 2339-40.) Bennett also stated that, as a result, Barnett was limited to performing one-to-two step tasks which required limited contact with the public. (R. at 2341.) A medical expert, Dr. Ward Stevens, M.D., also testified. Dr. Stevens stated that, based on his review of the record, Barnett should have been able to perform a "wide range" of light work. (R. at 2346.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. S. W. Bland, M.D.; Norton Community Hospital; Lonesome Pine Hospital; Dr. S. S. Tholpady, M.D.; Wise County Behavioral Health Services; Dr. Mark M. Taylor, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Ranjy Basa, M.D.; Dr. Karl W. Konrad, Ph.D., M.D.; Hugh Tenison, Ph.D., a state agency psychologist; Dr. F. Joseph Duckwall, M.D., a state agency physician; Dr. Kevin Blackwell, D.O.; St. Mary's Hospital; Dr. Donald R. Williams, M.D., a state agency physician; Foxglove Services; Dr. Michael Hartman, M.D., a state agency physician; Robert S. Spangler, Ed.D., a licensed psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. G. S. Kanwal, M.D.; Dr. Mark E. Shaffrey, M.D.; The Laurels; Big Stone Gap Pharmacy; Primary Care Pharmacy; CVS Pharmacy; Dana Claunch, Psy.D, a licensed clinical psychologist; Virginia Health Services Center; Frontier Health; Dr. Gary S. Williams, M.D.; Dr. Randall Pitone, M.D.; and Southwestern Virginia Mental Health Institute.

Barnett suffered a lumbosacral strain at work on January 15, 1997, when he slipped off of a walkway and twisted his back. (R. at 249.) Barnett again suffered a lumbar strain at work on June 21, 1999. (R. at 258.) Barnett was seen in the Norton Community Hospital emergency room that day with a complaint that he had felt something pop in his back. (R. at 254.) Barnett was diagnosed with a lumbar strain and was prescribed Percocet. (R. at 254.)

Dr. Kevin Blackwell, D.O., began treating Barnett in June 1999. On June 23, 1999, Dr. Blackwell stated that Barnett could not lift items weighing more than 15 pounds and could not push or pull items weighing more than 20 pounds. (R. at 252.) He also stated that Barnett could not perform repetitive motions or bending. (R. at 252.) Dr. Blackwell prescribed physical therapy. (R. at 260.) On July 7, 1999, Dr. Blackwell stated that Barnett could not lift items weighing more than 25 pounds and could not push or pull items weighing more than 30 pounds. (R. at 252.) He also stated that Barnett could not perform repetitive motions. (R. at 252.)

On August 3, 1999, Barnett presented to Wellmont Lonesome Pine Hospital complaining of back pain. (R. at 262.) Barnett was diagnosed with left sciatica, was given injections of Nubain, Vistaril and Norflex and was discharged to follow up with his family doctor the next day. (R. at 262.) On August 5, 1999, Barnett saw Dr. S. S. Tholpady, M.D., with complaints of back pain. (R. at 267.) Dr. Tholpady diagnosed lower back pain due to lifting and left sciatica and prescribed Darvocet. (R. at 267.) On October 6, 1999, an MRI was performed on Barnett's lumbar spine. (R. at 276.) The MRI revealed a small left paracentral disc protrusion at the L5-S1 level. (R. at 276.)

On October 20, 1999, Dr. Blackwell stated that Barnett complained of a back pain rating of a nine on a 10-point scale on some days. (R. at 275.) Barnett also complained of pain radiating into his left leg on a daily basis. (R. at 275.) Dr. Blackwell noted that Barnett's straight leg raises were negative, and his deep tendon reflexes were within normal limits. (R. at 275.) Dr. Blackwell noted that he reviewed an MRI which showed a left paracentral disc protusion at the L5-S1 level. (R. at 275.) Dr. Blackwell ordered an EMG to evaluate Barnett's leg pain. (R. at 275.) Dr. Blackwell released Barnett to his regular work activities, but he instructed him not to drive or operate machinery while taking his pain medication. (R. at 275.)

On November 1, 1999, Dr. Blackwell stated that Barnett could not lift items weighing more than 15 pounds and could not push or pull items weighing more than 25 pounds. (R. at 251.) He also stated that Barnett could not perform repetitive motions or bending, but he stated that Barnett could return to work without restrictions on November 10, 1999. (R. at 251.) Barnett returned to Dr. Blackwell on November 16, 1999. (R. at 273.) Barnett reported that he had coughed and felt an excruciating pain in his lower back which had resulted in difficulty walking. (R. at 273.) Dr. Blackwell noted that Barnett's L5-S1 area was tender with palpation, but it appeared to him that the tenderness was exaggerated. (R. at 273.) Dr. Blackwell stated that Barnett's straight leg raises were negative for pain below the knee. (R. at 273.) His note also states that: "Neurosensory is intact." (R. at 273.) Dr. Blackwell restricted Barnett to lifting and pushing and pulling items weighing 15 pounds or less, with no repetitive bending or lifting. (R. at 273.)

Barnett saw Dr. Blackwell again on December 1, 1999. (R. at 272.) On that date, Dr. Blackwell noted that Barnett had begun using a cane because he complained of his left leg giving out. (R. at 272.) Dr. Blackwell noted that Barnett's straight leg raises were negative, and his deep tendon reflexes were within normal limits. (R. at 272.) He again stated: "Neurosensory is intact." (R. at 272.) On January 12, 2000, Dr. Blackwell ordered an epidural steroid injection, which was performed by Dr. David Nauss, M.D., at Norton Community Hospital on January 17, 2000. (R. at 271, 277-78.) On February 22, 2000, Dr. Blackwell stated that Barnett could not lift items weighing greater than 30 pounds or push or pull objects weighing more than 35 pounds. (R. at 250.) Dr. Blackwell continued to treat Barnett through November 8, 2000, with little, if any, change in his condition. (R. at 268-71, 431-33.) None of Dr. Blackwell's notes make any mention of complaints of any psychological symptoms such as depression or anxiety.

On May 5, 2000, Barnett was treated at Lonesome Pine Hospital for a broken right hand. (R. at 279-83.) Barnett also has been treated for a number of falls, including a fall on February 17, 2000, a fall on October 29, 2000, and falls on November 5, 7, 9 and 14, 2000, May 16, 2001, August 25, 2001, January 23, 2002, January 30, 2002, May 31, 2002, July 2, 2002, August 21, 22 and 29 2002, August 12, 21 and 16, 2003, February 17, 2004, May 2004, August 10, 2004, November 21, 2004, and January 12, 2005. (R. at 284-89, 397-99, 405-13, 415-23, 425-28, 485-91, 517-22, 573, 606-11, 624-28, 635-41, 663, 666-73, 777-802, 1582-92, 1669, 1913-17, 1919-23, 1937.) These falls have resulted in multiple facial lacerations and lacerations and injuries to Barnett's arms and hands. (R. at 397-99, 405-13, 415-21, 485-90, 606-11, 624-28, 640, 777-97, 1584, 1591, 1667, 1669, 1917, 1919-20, 1937. ) The medical records note that Barnett claimed that these

falls were directly related to his left leg giving out, back pain or a loss of balance. With the exception of Dr. Konrad's January 17, 2001, examination, which is discussed in greater detail below, there is no evidence of any loss of strength, tone, function, sensation or reflex in Barnett's left leg. (R. at 443-45.)

On July 19, 2000, Dr. Donald R. Williams, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment stating that, based on his review of the evidence, Barnett could occasionally lift items weighing up to 40 pounds and frequently lift items weighing up to 25 pounds. (R. at 293-301.)

On July 23, 2000, Barnett was admitted to Lonesome Pine Hospital with complaints of chest pain. (R. at 303-05.) He was discharged on July 28, 2000, with a diagnosis of atypical and noncardiac chest pain. (R. at 302.)

The first mention of any psychological complaints by Barnett were noted by Dr. Mark M. Taylor, M.D., when he examined Barnett on August 18, 2000. (R. at 364.) Dr. Taylor noted that Barnett was positive for depression and stress. (R. at 364.) Dr. Taylor prescribed Effexor and Sonata. (R. at 364.) On August 24, 2000, Barnett complained that the Effexor was not working, so Dr. Taylor discontinued it and prescribed Klonopin and Paxil. (R. at 363.) While Dr. Taylor's notes reflect conversations between his staff and Barnett, it does not appear that he saw Barnett again until April 11, 2001. (R. at 459.) On April 17, 2001, Dr. Taylor completed an assessment stating that Barnett's work-related mental abilities were seriously limited or worse in all categories except for a satisfactory ability to follow work rules, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 456-58.) Dr. Taylor last saw Barnett on December 10, 2001. (R. at 571.)

Case 2:11-cv-00038-JPJ-PMS   Document 16   Filed 07/23/12   Page 10 of 27   Pageid#: 2451

On October 18, 2000, Dr. Michael Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment stating that, based on his review of the evidence, Barnett could occasionally lift items weighing up to 40 pounds and frequently lift items weighing up to 25 pounds. (R. at 365-72.) Dr. Hartman also stated that Barnett should be able to perform work that did not require heavy lifting. (R. at 371.)

Also on October 18, 2000, Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 373-87.) Tenison stated that Barnett suffered from a severe mental impairment that was not expected to last 12 months and which did not meet or equal a listed impairment. (R. at 373.) Tenison noted that Barnett had no restrictions of activities of daily living and had not experienced any repeated episodes of decompensation of extended duration. (R. at 383.) Tenison stated that Barnett had mild difficulties in maintaining social functioning and mild difficulties in maintaining concentration, persistence or pace. (R. at 383.) Tenison also stated that Barnett's condition would be expected to improve with treatment. (R. at 385.) Tenison stated that Barnett's activities were not significantly restricted due to a psychiatric impairment. (R. at 387.) Tenison also stated that Barnett's condition did not preclude all work activity. (R. at 387.)

Robert S. Spangler, Ed.D., a licensed psychologist, performed a consultative evaluation on Barnett on October 25, 2000, at his attorney's request. (R. at 388-94.) Spangler noted that Barnett seemed socially confident but depressed and anxious. (R. at 388.) Spangler stated that Barnett demonstrated erratic concentration but was appropriately persistent on the assessment tasks. (R. at 388.) Spangler noted that Barnett was alert and oriented. (R. at 390.) Barnett

complained of suicidal ideations and auditory hallucinations, including hearing bells and voices. (R. at 390.) Spangler performed intelligence testing, but stated that the results were not valid. (R. at 391.)

Barnett told Spangler that he suffered from chronic back pain due to a work-related injury. (R. at 389.) It is important to note that Barnett incorrectly told Spangler that he suffered a heart attack on July 23, 2000, which had led to chronic chest pain. (R. at 389.) On November 6, 2000, Spangler completed an assessment of Barnett's work-related abilities, which states that Barnett had a limited, but satisfactory, ability to maintain personal appearance and a seriously limited or no ability to perform all other occupational, performance and personal/social adjustments. (R. at 395-96.) Spangler diagnosed Barnett as suffering from a major depressive disorder, recurrent, severe with suicidal and auditory hallucinations, an anxiety disorder, not otherwise specified, mild to moderate, and low average intelligence. (R. at 391.)

On November 17, 2000, Barnett voluntarily admitted himself to The Laurels for detoxification. (R. at 477-82.) Barnett reported that he had begun to experience hallucinations after taking Prednisone prescribed for him by one of his physicians. (R. at 480.) Barnett was diagnosed with suffering from opioid abuse and was discharged after five days with no aftercare treatment. (R. at 479.) According to the notes provided, Barnett reported that he did not believe that he had a substance abuse problem. (R. at 479.) Barnett's then-current Global Assessment of Functioning, ("GAF"), score was assessed at 65. (R. at 479.)[5]

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 61-70 indicates "[s]ome mild symptoms ...

Dr. Mark E. Shaffrey, M.D., with the University of Virginia Health System Department of Neurological Surgery, examined Barnett on January 8, 2001. (R. at 473.) Dr. Shaffrey found that Barnett's back was minimally tender to palpation, but he found no significant evidence of muscle spasm. (R. at 473.) Dr. Shaffrey noted that Barnett's strength in his legs was normal with some pain limitation in the left leg which did not follow a radicular pattern. (R. at 473.) He found Barnett's muscle tone, sensation and reflexes to be normal. (R. at 473.) Dr. Shaffrey noted that an MRI performed in 1999 had revealed a small left L5-S1 disc protrusion, which did not appear to affect the nerve root. (R. at 473.) Dr. Shaffrey ordered a lumbar CT scan with myelogram. (R. at 473.) On June 19, 2001, Dr. Shaffrey reported that the CT scan with myelogram showed a left paracentral disc protusion which was adjacent to the S1 nerve root with "no significant mass effect." (R. at 492.) Dr. Shaffrey stated that he saw no need for surgical intervention and recommended continuing conservative treatment. (R. at 492.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, performed a consultative psychological evaluation on Barnett at the request of the state agency on January 13, 2001. (R. at 434-40.) Lanthorn noted that Barnett did not appear to be in any psychological distress on the date of the evaluation. (R. at 434.) Barnett was alert and coherent and answered questions readily. (R. at 434.) Barnett complained of suffering from anxiety. (R. at 435.) Barnett also reported that he had been treated at The Laurels for detoxification from some type of steroid medication, which he claimed made him "crazy." (R. at 435.) Barnett complained

_____

OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Case 2:11-cv-00038-JPJ-PMS   Document 16   Filed 07/23/12   Page 13 of 27   Pageid#: 2454

of trouble falling and staying asleep and that he had been nervous for the previous year-and-a-half. (R. at 437.)

Based on testing, Lanthorn estimated that Barnett's intellectual functioning level fell in the borderline to low average range. (R. at 439.) Lanthorn diagnosed Barnett with a dysthymic disorder, late onset (mild), alcohol and cannabis dependence in sustained full remission by self-report and borderline intellectual functioning. (R. at 439.) Lanthorn placed Barnett's then-current GAF score at 65 to 70. (R. at 439.) Lanthorn stated that, while it appeared that Barnett suffered from depression, his symptoms of depression were not significantly limiting. (R. at 440.) Instead, Lanthorn stated that much of Barnett's difficulties appeared to be due to his physical complaints. (R. at 440.) Lanthorn also completed an assessment of Barnett's work-related abilities which stated that Barnett had a satisfactory or better ability to make all occupational, performance and personal/social adjustments. (R. at 441-42.)

On January 17, 2001, Dr. Karl W. Konrad, Ph.D., M.D., performed a consultative examination on Barnett at the request of the state agency. (R. at 443-45.) Barnett complained of back pain radiating into his left leg. (R. at 443.) Dr. Konrad's examination revealed a full range of motion in all of Barnett's joints. (R. at 444.) Dr. Konrad observed no tenderness or spasm in Barnett's back. (R. at 444.) Dr. Konrad noted some muscle wasting in the left thigh. (R. at 444.) Dr. Konrad noted that Barnett's reflexes were normal and symmetrical. (R. at 444.) Dr. Konrad diagnosed a limited range of motion of Barnett's lumbar spine with normal x-rays. (R. at 445.)

Case 2:11-cv-00038-JPJ-PMS   Document 16   Filed 07/23/12   Page 14 of 27   Pageid#: 2455

Dr. Konrad also completed an assessment of Barnett's work-related abilities which stated that he could occasionally lift and carry items weighing up to 30 pounds and frequently lift and carry items weighing up to 20 pounds. (R. at 446-48.) Dr. Konrad stated that standing and walking was not affected by Barnett's impairment. (R. at 446.) Dr. Konrad stated that Barnett could sit for up to six hours in an eight-hour workday, but could do so for only 30 minutes without interruption. (R. at 447.) Dr. Konrad also stated that Barnett's ability to push and pull was limited. (R. at 447.)

On November 11, 2001, Barnett was admitted into Lonesome Pine Hospital for an overnight stay for treatment of his recently diagnosed diabetes. (R. at 576.)

On January 3, 2002, Dr. Richard M. Surrusco, M.D., a state agency physician, completed an assessment of Barnett's work-related abilities. (R. at 681-90.) Dr. Surrusco stated that Barnett could occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds. (R.at 682.) Dr. Surrusco noted no other limitations on Barnett's work-related abilities.

Barnett began mental health treatment with Frontier Health, Inc., through the Wise County Counseling Center on January 11, 2002. (R. at 546-58.) Barnett complained of suffering from a depressed mood since June 1999. (R. at 546.) Barnett also reported that he had attempted suicide in 2000 due to an allergic reaction to some medication he was taking. (R. at 546.) On July 29, 2002, Eric T. Greene, a licensed professional counselor, noted that Barnett appeared to be physically uncomfortable, and his mood appeared to be depressed. (R. at 534.) Greene stated that Barnett appeared to be in a grief/loss pattern associated with his physical injury. (R. at 534.)   On September 13, 2002, James Kegley, M.S.,

recommended that Barnett begin participating in the Life Changes group therapy as part of his treatment goals. (R. at 748.) It does not appear that Barnett ever complied with this treatment option. (R. at 740-47.)

Barnett began treatment with Dr. Ranjy Basa, M.D., and Carol Looney, F.N.P., at Stone Mountain Health Services on March 11, 2002. (R. at 705.) Barnett complained of depression and multiple problems. (R. at 705.) On April 26, 2002, Barnett saw Looney for complaints of pain in the left chest and shoulder. (R. at 702.) It appears that Dr. Basa and Looney have primarily provided prescriptions for Barnett's medications. On November 7, 2002, Barnett complained of chronic back pain and left leg weakness. (R. at 753.) Dr. Basa's note reflects that Barnett was walking with the aid of a walker. (R. at 753.)

On June 13, 2002, Dr. Basa completed an assessment of Barnett's work-related mental abilities. (R. at 694-96.) Dr. Basa stated that Barnett's abilities were seriously limited or worse in every area except for a satisfactory ability to understand, remember and carry out complex job instructions and to maintain personal appearance and a more than satisfactory ability to follow work rules and to understand, remember and carry out detailed and simple job instructions. (R. at 694-95.) Dr. Basa also noted that Barnett had not provided him with medical records documenting his continuing treatment for chronic back pain, nor had he provided Dr. Basa with any records from his mental health counseling. (R.at 695-96.) Dr. Basa also noted that Barnett had not followed medication instructions. (R. at 695.)

On February 13, 2003, Dr. Basa noted that Barnett's depression was doing well on Zoloft. (R. at 818.) On March 21, 2003, Dr. Basa completed an assessment

of Barnett's work-related abilities on which he stated that Barnett could occasionally and frequently lift items weighing less than 10 pounds. (R. at 822-25.) Dr. Basa stated that Barnett could stand or walk for less than two hours in an eight-hour workday and sit for less than six hours. (R. at 822-23.) Dr. Basa stated that Barnett's abilities to push and pull with his upper extremities and to reach were limited, and that he could never climb, balance, kneel, crouch, crawl or stoop. (R.at 823-24.) He also noted that Barnett's exposure to temperature extremes, vibration and hazards should be limited. (R. at 825.)

Dr. Konrad evaluated Barnett again on April 3, 2002. (R. at 708-10.) Dr. Konrad found no tenderness or muscle spasms in Barnett's back, but reported a limited range of motion of the lumbar spine. (R. at 709-10.) Dr. Konrad noted that Barnett had normal muscle tone and strength in his lower extremities, as well as normal reflexes. (R. at 709.)

State agency psychologist Tenison completed another PRTF on Barnett's condition on May 8, 2002. (R. at 711-26.) Tenison stated that Barnett did not suffer from a severe mental impairment. (R. at 711.) Tenison stated that there was insufficient evidence from which to determine whether Barnett experienced any restriction of activities of daily living or any difficulties in maintaining social functioning. (R. at 723.) Tenison stated that Barnett experienced mild difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation of extended duration. (R. at 723.)

Dr. F. Joseph Duckwall, M.D., a state agency physician, completed an assessment of Barnett's work-related abilities on May 22, 2002. (R. at 727-37.) Dr. Duckwall stated that Barnett could occasionally lift items weighing up to 20

pounds and could frequently lift items weighing up to 10 pounds. (R. at 728.)  He found that Barnett could occasionally climb, balance, stoop, kneel, crouch and crawl.  (R. at 732.) Dr. Duckwall placed no other restrictions on Barnett's work activities.

Lanthorn performed another consultative psychological evaluation on Barnett at the request of the state agency on January 4, 2003. (R. at 804-14.) Lanthorn  noted that Barnett walked with the aid of a walker, but he did not appear to be in any psychological distress on the date of the evaluation. (R. at 804.) Barnett stated that he suffered from chronic back pain and problems with his left leg going numb, causing him to fall. (R. at 805.) Barnett was rational, coherent and alert and was able to concentrate and attend to the task at hand. (R. at 807.)

The Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), was performed, and Barnett received a verbal IQ score of 73, a performance IQ score of 72 and a full-scale IQ score of 70, placing him in the boderline range of intellectual functioning. (R. at 808.)  The Miller Forensic Assessment of Symptoms Test, ("M-FAST"), also was administered, and Barnett's scores suggested that he might be malingering or exaggerating his psychological symptoms. (R. at 809-10.)

Lanthorn diagnosed Barnett as suffering from a dysthymic disorder, late-onset, and borderline intellectual functioning.  (R. at 810.) He placed Barnett's then-current GAF score at 65. (R. at 810.) Lanthorn stated that Barnett was displaying symptoms of depression, but that these symptoms did not appear to be significant. (R. at 810.) Lanthorn also completed an assessment of Barnett's work-related mental abilities on which he stated that Barnett had a satisfactory or better ability in all areas. (R. at 812-14.)

Case 2:11-cv-00038-JPJ-PMS   Document 16   Filed 07/23/12   Page 18 of 27   Pageid#: 2459

The record also includes an undated "Diagnostic Synthesis" by Dana P. Claunch, Psy.D., a licensed clinical psychologist. (R. at 501-03.) It appears that Claunch's report was prepared as a result of a review of the medical evidence of record and not based on an evaluation of Barnett. In large part, it simply summarizes the medical evidence provided for review. Claunch did state that:

> A physiological disorder that is a direct result of psychological conflict is apparent and appears to exert a controlling influence on Mr. Barnett's interaction with other people. Introversion, somatization, and depression are characteristic symptoms. Mr. Barnett likely has developed a symptom picture in allowance for avoidance. ... The continuing complaints of chronic pain may be more accurately diagnosed as depression.

(R. at 502.)

In the summer of 2004, Barnett was admitted to Southwestern Virginia Mental Health Institute, ("SVMHI"), for inpatient psychiatric treatment on two occasions. (R. at 1685-97.) Barnett was admitted on June 28, 2004, because of suicidal ideation after his wife told him their relationship was over after 14 years of marriage. (R. at 1685.) Barnett was discharged two days later with no suicidal ideations or evidence of depression. (R. at 1688.) Barnett was again admitted on July 9, 2004, after attempting to hang himself by jumping off of a building. (R. at 1692-96.) The staff at SVMHI repeatedly commented on their belief that Barnett's mental health claims were related to his attempt to gain disability benefits. (R. at 1714, 2001, 2017.)

Dr. Randall Pitone, M.D., a psychiatrist, saw Barnett for follow-up care on September 21, 2004. (R. at 1987-88.) Dr. Pitone noted Barnett's recent psychiatric

admissions, but he stated that the staff at SVMHI were of the belief that Barnett's admissions were an attempt to gain disability benefits and that his symptoms were not serious enough to warrant disability. (R. at 1987.) Dr. Pitone noted that Barnett's mood was not depressed and that he was not noticeably anxious. (R. at 1988.) Dr. Pitone stated that Barnett's affect was generally appropriate, his perception was clear, his thought associations were intact, his thinking appeared organized and goal-directed with normal rate and flow, he did not express any odd, bizarre or delusional thought content or feelings of hoplessness or helplessness, he claimed to be getting along adequately, his intelligence was estimated in the normal range, his memory and cognitive function appeared to be intact, and his insight was adequate. (R. at 1988.) Dr. Pitone diagnosed Barnett with an adjustment disorder with depressed mood and estimated his GAF score at 55.[7] (R. at 1988.) Barnett continued to treat with Dr. Pitone and the staff at SVMHI through April of 2007 when he told them he no longer needed their services. (R. at 2200.)

Dr. Gary S. Williams, M.D., provided routine medical care to Barnett from June 2003 to May 3, 2007 for diabetes, high blood pressure, low back pain and erectile dysfunction. (R. at 1667-81, 1816-18, 1837-42, 1874-81, 1900-05, 2087-89, 2119-20, 2209-11.) On February 18, 2004, Dr. Williams stated that Barnett was totally and permanently disabled. (R. at 1669.) On April 22, 2004, Dr. Williams completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) form stating the Barnett could lift/carry items weighing less than 10 pounds, stand/walk for less than one hour in an eight-hour workday, must alternate between standing and sitting and could never climb, balance, kneel,

---

[7] A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

crouch, crawl or stoop. (R. at 1670-71.) On October 14, 2004, Barnett told Dr. Williams that his blood sugar level was under excellent control and that he was not depressed, although he did say that he had suffered some panic attacks during the past couple of months. (R. at 1879.) On May 15, 2006, Barnett told Dr. Williams he was doing "quite well." (R. at 2087.)  Barnett stated that his blood sugar levels were doing well and that he was not having any nerve problems. (R. at 2087.) Barnett did not complain of back pain. (R. at 2087.) On May 3, 2007, Barnett told Dr. Williams he was "doing fine." (R. at 2209.)

State agency psychologist Tenison completed another PRTF on Barnett's condition on December 13, 2005. (R. at 2072-86.) Tenison stated that Barnett did not suffer from a severe mental impairment. (R. at 2072.) Tenison stated that Barnett's depression appeared to be well-controlled on medication. (R. at 2086.) Tenison stated that Barnett experienced mild restrictions of activities of daily living and mild difficulties in maintaining concentration, persistence or pace. (R. at 2082.)  Louis A. Perrott, Ph.D., also a state agency psychologist, reviewed and agreed with Tenison's assessment on August 5, 2006. (R. at 2072.)

On January 20, 2006, Dr. Blackwell performed a consultative examination of Barnett. (R. at 2059-63.)  Barnett claimed that he fell often and that he could not walk without a cane due to balance problems. (R. at 2059.)  Dr. Blackwell's physical examination found Barnett's gait symmetrical and balanced, although he used a cane. (R. at 2061.) Barnett's upper and lower extremities were normal for size, shape, symmetry and strength; Barnett's grip strength was good, fine motor skills of the hands were normal; and upper and lower extremity reflexes were good and equal bilaterally, but somewhat diminished. (R. at 2061.) Dr. Blackwell stated that Barnett could lift items weighing up to 25 pounds maximally and up to 15

pounds frequently. (R. at 2062.) Dr. Blackwell stated that Barnett could stand for up to four hours in an eight-hour workday, changing positions every 10-15 minutes, and sit for eight hours in an eight-hour workday, changing positions every 30 minutes. (R. at 2062.) He also stated that Barnett's overhead reaching should be limited to less than two-thirds of the time. (R. at 2062.) Dr. Blackwell also stated, "I do not believe he needs a cane from a physical standpoint or from a strength testing standpoint." (R. at 2062.)

Dr. Michael J. Hartman, M.D., a state agency physician, completed an assessment of Barnett's work-related abilities on January 30, 2006. (R. at 2064-68.) Dr. Hartman stated that Barnett could occasionally lift items weighing up to 20 pounds and could frequently lift items weighing up to 10 pounds. (R. at 2065.) He found that Barnett could stand and/or walk for at least two hours in an eight-hour workday, sit for about six hours in an eight-hour workday and that he was limited in his ability to push and pull with his lower extremities. (R. at 2065.) He also found that Barnett could not climb ladders, ropes or scaffolds and must avoid exposure to hazards such as machinery and heights. (R. at 2066-67.) Dr. Hartman placed no other restrictions on Barnett's work activities.

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2012). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can

return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2012).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 5, 2011, the ALJ denied Barnett's claims for benefits. (R. at 867-99.) The ALJ found that Barnett met the insured status requirements of the Act for DIB purposes and was insured for benefits through the period for which he was seeking benefits. (R. at 897-98.) The ALJ found that Barnett had not engaged in substantial gainful activity during this period. (R. at 898.) The ALJ also found that the medical evidence established that Barnett had severe impairments, namely a back impairment, diabetes, obesity, a depression/adjustment disorder and an anxiety disorder, but the ALJ found that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 893.) The ALJ found that Barnett's allegations regarding his limitations were not totally credible. (R. at 898.) The ALJ found that Barnett had the residual functional capacity to perform

Case 2:11-cv-00038-JPJ-PMS   Document 16   Filed 07/23/12   Page 23 of 27   Pageid#: 2464

light work that did not require any pushing or pulling with his extremities of weights heavier than 20 pounds, climbing ladders, ropes or scaffolding or exposure to working around hazardous machines, at unprotected heights or on vibrating surfaces. (R. at 895.) The ALJ also found that Barnett could perform only simple, routine, repetitive, unskilled tasks. (R. at 895.) The ALJ further found that Barnett could return to his past relevant work as fast food worker. (R. at 896.) The ALJ also found that Barnett could perform other jobs that existed in the national economy in significant numbers. (R. at 896-97.) Thus, the ALJ found that Barnett was not under a disability, as defined in the Act, and was not entitled to benefits. (R. at 898-99.) *See* 20 C.F.R. §§ 404.1520(f), (g) 416.920(f), (g).

In his brief, Barnett argues that the ALJ's decision is not supported by substantial evidence of record. In particular, Barnett argues that the ALJ's finding as to his residual function capacity is not supported by substantial evidence and that the ALJ did not properly consider his obesity in combination with his other impairments. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 10-16.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Based on my review of the record, I find that substantial evidence supports the ALJ's finding as to Barnett's residual functional capacity. The ALJ's 33-page opinion is thorough and complete. From the plain language of the opinion it is clear that the ALJ considered Barnett's obesity in combination with his other impairments in assessing his residual functional capacity. (R. at 893.) The ALJ's finding that Barnett had the residual functional capacity to perform light work that did not require any pushing or pulling with his extremities of weights heavier than 20 pounds, climbing ladders, ropes or scaffolding or exposure to working around hazardous machines, at unprotected heights or on vibrating surfaces is supported by the assessments of Dr. Blackwell, both in a treating and consultative capacity, the consultative physician Dr. Konrad and the state agency reviewing physicians Drs. Donald Williams, Surrusco, Hartman and Duckwall. The ALJ's finding that Barnett could perform only simple, routine, repetitive, unskilled tasks is supported by the assessments of consultative psychologist Lanthorn, state agency reviewing psychologists Tenison and Perrott, as well as by the medical reports of Dr. Pitone, a treating psychiatrist. While it is obvious that Barnett had a difficult time emotionally during the breakup of his marriage in the summer of 2004, the medical record shows that his depression responded well to treatment. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists to support the Commissioner's residual functional capacity finding; and

2.     Substantial evidence exists to support the Commissioner's finding that Barnett was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Barnett's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2012):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

Case 2:11-cv-00038-JPJ-PMS   Document 16   Filed 07/23/12   Page 26 of 27   Pageid#: 2467

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 23rd day of July 2012.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE